# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 2:20-CR-94(1)** |
| **Plaintiff,** | **JUDGE SARAH D. MORRISON** |
| **v.** | |
| **ROBERT K. ASANTE,** | **Sentencing Memorandum of the United States** |
| **Defendant.** | |

The United States hereby submits its Sentencing Memorandum with respect to Defendant Robert K. Asante. The Defendant has multiple pending objections. For the reasons that follow, a sentence of 84 months of imprisonment, 3 years of supervised release, and a restitution order of $11,834,494.05, jointly and severally with his codefendants, would be sufficient but not greater than necessary to achieve the statutory goals of sentencing. Forfeiture is also required in this case.

## BACKGROUND

On March 4, 2020, Mr. Asante was arrested after having been charged by Criminal Complaint with one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h), and was ordered released subject to certain conditions. (*See* Complaint, R.3; Release Order, R.7.)

On June 23, 2020, a grand jury in this District returned an Indictment charging Robert K. Asante, Kwame Yeboah, and Eric Ahiekpor with one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). (Indictment, R.22.) On July 8, 2021, the grand jury returned a Superseding Indictment, which added both defendants and charges to the case. (Superseding Indictment, R.85.)

On December 2, 2021, the grand jury returned a Second Superseding Indictment, which is the operative charging instrument. (Second Superseding Indictment, R.152.) It charged Mr. Asante and others with participating in a Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). (*Id.* at 782–85.) It also charged Mr. Asante with multiple counts of Concealment Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). (*Id.* at 786–88.) And it charged him with multiple counts of 18 U.S.C. § 1957. (*Id.* at 788–90.) These charges all concerned Mr. Asante's involvement in laundering the proceeds of online romance fraud.

Mr. Asante was also charged with participating in a Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 1349. (*Id.* 791–93.) According to the Second Superseding Indictment, a romance fraud victim transferred $272,000 to a bank account in the name of Mr. Asante's girlfriend Alexis Wellington. (*Id.* at 791.) The bank froze the funds, and Ms. Wellington made repeated false statements to the bank in an effort to get the bank to unfreeze the funds. (*Id.* 791–93.) The Second Superseding Indictment alleged that Mr. Asante directed Ms. Wellington to make these false statements and participated in some of her conversations with the bank. (*Id.*)

Mr. Asante was also charged with one count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A. (*Id.* at 794.) Finally, the Second Superseding Indictment provided notice of the United States' intent to seek forfeiture of any property involved in the criminal acts. (*Id.* at 794–95.)

On May 31, 2022, the United States learned that Mr. Asante had caused a plane ticket to be purchased for him to fly from Columbus to Toronto, with a layover in Charlotte, North Carolina. The United States filed an emergency ex parte motion to revoke the defendant's release. (Motion, R.205.) The Court issued an arrest warrant, and Mr. Asante was arrested on June 2, 2022.

On June 8, 2022, Magistrate Judge Vascura held a hearing to determine whether Mr. Asante's release should be revoked. After the Parties put on evidence, Magistrate Judge Vascura revoked his release and ordered him detained. The Court issued an Order and Opinion later that day. (Opinion and Order, R.216.)

On June 27, 2022, Mr. Asante filed a motion to revoke Magistrate Judge Vascura's detention order. (Motion, R.221.) The Court denied his motion on July 20, 2022, and ordered that Mr. Asante would remain detained pending sentencing. (Order, R.228.)

On August 15, 2022, the Parties filed a Plea Agreement, wherein Mr. Asante agreed to plead guilty to the Money Laundering Conspiracy count of the Second Superseding Indictment. (Plea Agreement, R.229 at 1107.) The Plea Agreement was pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and the Parties agreed that the appropriate disposition in this case was a term of incarceration of between 36 months and 84 months, inclusive. (*Id.* at 1109.) Mr. Asante agreed to restitution as ordered by the Court. (*Id.* at 1109–10.) He represented that he understood the United States believed the proper amount of restitution was $11,834,494.05, and agreed that restitution should not be less than $2,830,024.91. (*Id.*) He also agreed to surrender for forfeiture all property involved in the conspiracy. (*Id.* at 1110–11.) The United States agreed to dismiss the remaining counts of the Second Superseding Indictment at sentencing. (*Id.* at 1111.) On August 26, 2022, Mr. Asante entered his guilty plea. (*See* Minute Entry, R.231.)

The Probation Office released the Final Presentence Investigation Report on November 17, 2022. (PSR, R.264.) Sentencing is scheduled for January 3, 2022.

**ARGUMENT**

The Probation Officer calculated that Mr. Asante's Total Offense Level is 33 and that his Criminal History Category is I. PSR ¶¶ 120, 123. The Probation Officer correctly noted that these calculations would result in advisory guidelines ranges of 135 to 168 months of imprisonment; a fine of $35,000 to $23,668,988.10; and supervised release of 1 to 3 years. PSR ¶¶ 153, 157, 163. There are unresolved objections. The United States will first respond to Mr. Asante's pending objections, and then turn to the statutory sentencing factors under 18 U.S.C. § 3553(a).

**I.    All of Mr. Asante's objections should be overruled.**

In a letter dated October 25, 2022, Mr. Asante raised several objections to the PSR. Some of these objections were resolved during the PSR process. At least three remain pending that affect the calculation of the applicable guidelines range. All three objections should be overruled.

> **A.    The Probation Officer correctly applied an enhancement on the ground that Mr. Asante was "in the business of laundering funds."**

In his first objection, Mr. Asante objects to the conclusion that he was "in the business of laundering funds." (*See* Asante Objection Letter, R.264–1 at 1363; PSR ¶¶ 110–11.) Because the enhancement is proper, the objection should be overruled.

In money-laundering cases, Section 2S1.1(b)(2) directs courts to apply the greatest of three possible offense-level increases: (1) a one-level increase "[i]f the defendant was convicted under 18 U.S.C. § 1957"; (2) a two-level increase "[i]f the defendant was convicted under 18 U.S.C. § 1956"; and (3) a four-level increase "[i]f (i) subsection (a)(2) applies; and (ii) the defendant was in the business of laundering funds." U.S.S.G. § 2S1.1(b)(2)(A)–(C).

The PSR found that the four-level increase applies because Mr. Asante was "in the business of laundering funds." PSR ¶ 111. Mr. Asante disagrees. Although he does not say so

4

explicitly, the implication of the objection is that he believes the two-level increase for being convicted under § 1956 should apply instead.

Application Note 4 to § 2S1.1 provides guidance for when a defendant is "in the business of laundering funds." *See* U.S.S.G. § 2S1.1 app. n.4. The application note provides that the sentencing court "shall consider the totality of the circumstances," and enumerates a "non-exhaustive list of factors" that may be relevant to the question. Relevant factors include that the defendant: (1) "regularly engaged in laundering funds," (2) "engaged in laundering funds during an extended period of time," (3) "engaged in laundering funds from multiple sources," (4) "generated a substantial amount of revenue in return for laundering funds," (5) "had one or more prior convictions" for a money-laundering offense or similar offense, and (6) made certain statements "[d]uring the course of an undercover government investigation." U.S.S.G. § 2S1.1 app. n.4(A)–(B).

Mr. Asante concedes that the first three factors apply to him. (Asante Objection Letter, R.264–1 at 1363.) He does not agree that the fourth factor—that he "generated a substantial amount of revenue in return for laundering funds"—applies to him. (The Parties agree that the fifth and sixth factors do not apply here.) His concessions are significant on their own. The Court could properly apply the four-level enhancement based on findings that Mr. Asante regularly engaged in laundering funds, engaged in laundering funds during an extended period of time, and engaged in laundering funds from multiple sources. Beyond that, Mr. Asante is wrong that he did not generate a substantial amount of revenue.

The evidence overwhelmingly establishes that Mr. Asante generated a substantial amount of revenue in return for laundering funds. Repeatedly, and spanning nearly five years, Mr. Asante had conversations with coconspirators that revealed he was receiving 10% or more of the

amount of the fraud proceeds he laundered. Given that he laundered $2,830,324.91 through accounts in his direct control, and millions more with coconspirators he recruited, that amounts to hundreds of thousands of dollars he received for his criminal activity.

These conversations about Mr. Asante's percentage date back to at least 2015. Attached is an excerpt of a WhatsApp conversation between Mr. Asante and a person this Sentencing Memorandum will refer to as DB, a member of the fraud conspiracy who resided in Ghana. (*See* Exhibit A, Excerpt 1 of Conversation with DB.) (Although the United States is filing redacted versions of the Exhibits to avoid identifying uncharged third-party wrongdoers publicly, the Court can obtain unredacted versions from the Probation Office or the United States.) On October 13, 2015, Mr. Asante sent account information for a Bank of America account in his then-wife's name. (*Id.* at 2.) Mr. Asante stated, "Her account can Take any amount." (*Id.* at 4.) DB stated that Mr. Asante's percentage will be "10% bcos [because] me and my guy who bring the job go spend 5%." (*Id.*)

Later that day, Mr. Asante told DB, "Seen it boss," and "$15000." (*Id.* at 6–7.) A review of bank records shows that a $15,000 transfer was in fact sent to the bank account of Mr. Asante's then-wife on October 13, 2015. DB asked Mr. Asante, "How much share boss." (*Id.* at 9.) Mr. Asante replied, "10% is $1500." (*Id.* at 10.) From the early days of the conspiracy, Mr. Asante was receiving 10% of the fraud money laundered through accounts in his control.

Mr. Asante and DB discussed Mr. Asante's percentage again on November 2, 2015. (*See* Exhibit B, Excerpt 2 of Conversation with DB.) DB wrote, "The money be 30k." (*Id.* at 1.) Mr. Asante asked whether it was coming to his account or his wife's account, and DB replied that it was coming to Mr. Asante's wife's account. (*Id.*) He also told Mr. Asante that it was a "15% take but we talking [taking] 5% and you take 10% boss! This time a lot of guys are doing this same

business in the state." (*Id.* at 3.) This again shows that Mr. Asante was receiving 10% of the laundered funds as payment.

Mr. Asante also discussed receiving 10% in a similar WhatsApp conversation with a person using a Ghanaian phone number ending in x7577. (Exhibit C, Excerpt of Conversation with x7577.) On March 17, 2016, the other individual told Mr. Asante that Mr. Asante's account would be receiving "20k," and said, "We giving you 10% and I share the 5% with some guys behind the work." (*Id.* at 1.) When the other individual later told Mr. Asante that "[t]he 20k is on the way," Mr. Asante replied, "Ok." (*Id.* at 6–7.)

Mr. Asante discussed a larger percentage in a WhatsApp conversation with a person this Sentencing Memorandum will refer to as OP. (Exhibit D, Excerpt 1 of Conversation with OP.) On September 12, 2016, Mr. Asante sent information for a bank account in his own name. (*Id.* at 1.) The other individual told Mr. Asante that the money would be coming from Australia and requested that Mr. Asante confirm that the account information Mr. Asante had sent would be "all the client will need at the bank." (*Id.* at 2.) "Client" is a euphemism for romance-fraud victim. OP stated that he did not "want her to contact me that she still need infor[mation] again." (*Id.*) Mr. Asante called the other person "Chairman"—a term of respect—and said, "20% oo. No more 15%...lol." The other person replied, "Lol."

On August 22, 2017, Mr. Asante agreed with a coconspirator that his take would be 20%. (*See* Exhibit E, Excerpt of Conversation with BW.) A person this Sentencing Memorandum will refer to as BW complained that Mr. Asante's failure to reply would cause the "client" to "change their mind" about sending money. (*Id.* at 1.) After Mr. Asante indicated he was available, BW stated that a woman from Kansas City would be sending $1,600 to Mr. Asante. (*Id.* at 1–3.) BW told Mr. Asante to pick up the money and then send it to another person. (*Id.* at 3–4.) Mr. Asante

asked about his percentage cut: "25% ryt [right] boss…lol." (*Id.* at 5.) BW corrected him: "Lol. Nope %20." (*Id.*) Apparently having agreed to 20%, Mr. Asante then sent details about the transactions he had conducted. (*Id.* at 6–7.)

Mr. Asante's conversations about his percentage continued in 2019, in a similar conversation on February 6, 2019, with a person this Sentencing Memorandum will refer to as ID. (*See* Exhibit F, Excerpt of Conversation with ID.) ID asked Mr. Asante whether he had found an account to receive money. (*Id.* at 1.) Mr. Asante asked how much money would be coming in and his percentage. (*Id.*) ID told him "50k" and "10%." (*Id.* at 2.) Mr. Asante begged, "Boss 15% pls pls boss," but ID would not budge. (*Id.*)

Mr. Asante discussed his percentage take with codefendant Uriah Lamdul, too. (*See* Exhibit G, Excerpt 1 of Conversation with Uriah Lamdul.) On September 24, 2019, Mr. Lamdul asked him, "So how the talk go with your guys about percentage bro?" (*Id.* at 2.) Mr. Asante replied, "He still don't wanna go up cos errbody [everybody] else goes wit dat percentage but I'm still talking to him." (*Id.*) Mr. Asante also wrote, "little by little we will make it big." (*Id.* at 3.) Mr. Lamdul complained that he "didn't kno I'll be doing all dat extra stuff that's why I said coo but if u ask me if things go down they in the clear and ima have to face the consequences. Am just think bout me rn [right now] bro, faces all over them cameras." (*Id.* at 4.) In other words, Mr. Lamdul believed that he deserved a larger percentage because he was engaged in illegal activity and his face was on the cameras at the bank. Ultimately, Mr. Lamdul acquiesced: "Bro you don't have to talk to ur guys about the percentage anymore. 10% is fine with me." (*Id.* at 11.)

These messages establish that for years, Mr. Asante received 10% or more of the fraud proceeds laundered through his accounts. Given that he laundered millions of dollars of victim money, that is a "substantial amount" within the meaning of the guidelines.

On top of these messages, the financial activity matches the conclusion that Mr. Asante generated a substantial amount of revenue in return for laundering funds. The financial transactions involved ATM cash withdrawals in the United States, ATM cash withdrawals in Ghana, and spending of the fraud proceeds. (Plea Agreement, R.229 at 1114.) This financial activity is consistent with Mr. Asante extracting his share of the fraud proceeds.

Put together, the evidence establishes that Mr. Asante generated a substantial amount of revenue in return for laundering funds. The Probation Officer correctly concluded that Mr. Asante was in the business of laundering funds because he regularly engaged in laundering funds; he engaged in laundering funds during an extended period of time; he engaged in laundering funds from multiple sources; and he generated a substantial amount of revenue in return for laundering funds. The PSR correctly applied the four-level enhancement under U.S.S.G. § 2S1.1(b)(2)(C).

### B. The Probation Officer correctly determined that Mr. Asante was an organizer or leader of a criminal activity that involved five or more participants.

Mr. Asante next contends that he does not deserve an aggravating role enhancement and in fact deserves a mitigating role reduction. (*See* Asante Objection Letter, R.264–1 at 1364–65; PSR ¶¶ 113–14.) The contention lacks merit. The Probation Officer is correct that a four-level enhancement for being an "organizer or leader" is appropriate.

The Sentencing Guidelines call for a four-level enhancement when the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was

otherwise extensive." U.S.S.G. § 3B1.1(a). Application Note 4 to Section 3B1.1 provides a non-exhaustive list of factors to consider in deciding a defendant's role, and also clarifies that a criminal conspiracy can have more than one leader or organizer.

Here, there is no doubt that the criminal activity involved five or more participants. Seven were indicted: Mr. Asante, Kwame Yeboah, Eric Ahiekpor, Edward Amankwah, Mohamed Toure, Uriah Lamdul, and Alexis Wellington. As described elsewhere in this Sentencing Memorandum, the conspiracy included additional coconspirators who have not yet been indicted, including multiple individuals in Ghana who defrauded victims and worked with Mr. Asante and others to launder the fraud proceeds.

Mr. Asante played a leadership role in the money laundering activity. The fraudsters in Ghana had a problem: Victims were willing to send them money, totaling millions of dollars, but the funds could not be sent directly to the fraudsters. Financial institutions block large wires from the United States to Ghana, which banks regard as a high-risk jurisdiction. Directing the funds to Ghana also risked raising the victims' suspicions, since the victims' purported lovers commonly represented that they were in countries other than Ghana. To solve this problem, the fraudsters recruited individuals in the United States to act as go-betweens. The money launderers agreed to accept funds from victims and to engage in financial transactions to hide the fraud scheme from banks, law enforcement, and victims.

Mr. Asante and his codefendants served as this connective tissue between the fraudsters and the fraud victims. At first, Mr. Asante accepted money into accounts in his own name. The scale of the fraud necessitated more accounts, however, so he recruited his codefendants to open accounts in their names. After communicating with fraudsters in Ghana, Mr. Asante gave his

codefendants direction about what financial transactions to conduct to launder the fraud proceeds. He was the organizer and leader of this U.S.-based group of money launderers.

The evidence supports that Mr. Asante was an organizer or leader and deserves a four-level role enhancement. Start with his Plea Agreement. He agreed that he "put other individuals in the United States in touch with individuals in Ghana or *had them help him receive and transfer funds.*" (Plea Agreement, R.229 at 1114 (emphasis added).) "These individuals included the Co-Defendants, Mr. Yeboah, Mr. Ahiekpor, Mr. Amankwah, Mr. Toure, Mr. Lamdul, and/or Ms. Wellington." (*Id.*) By affirming this Statement of Facts at his plea hearing, he has already admitted under oath that he involved others in helping him launder fraud proceeds.

Mr. Asante's Plea Agreement included more specific facts when it comes to his codefendant and girlfriend Alexis Wellington. Mr. Asante agreed that he:

> *directed* his then-girlfriend Ms. Wellington to make false statements to a financial institution. On November 23, 2018, Ms. Wellington received $272,000 into a JPMorgan Chase Bank account in her control and in the name of Lexis Solutions Group, LLC. The bank froze the funds. Ms. Wellington contacted the bank several times in an effort to gain access and control of the funds. In doing so, she made several false statements to bank employees *at the direction of Mr. Asante*.

(*Id.* (emphases added).) The Plea Agreement described additional false statements that Ms. Wellington made to employees of financial institutions. (*Id.* at 1115.) Mr. Asante agreed that Ms. Wellington "made these false statements at the direction of Mr. Asante." (*Id.*)

These admissions are consistent with Ms. Wellington's admissions in her plea agreement. Ms. Wellington made several representations about Mr. Asante in her Statement of Facts:

- "Mr. Asante recruited Ms. Wellington to join the conspiracy. He also directed the criminal acts of Ms. Wellington."

- "Mr. Asante also directed Ms. Wellington to engage in financial transactions in furtherance of the conspiracy."

- "Ms. Wellington contacted the bank several times in an effort to gain access and control of the funds. In doing so, she made several false statements to bank employees at the direction of Mr. Asante."

(Wellington Plea Agreement, R.137 at 705.) Her plea agreement went on to describe her false statements in four additional paragraphs. At the end of each paragraph, she agreed that she "made these false statements at the direction of Mr. Asante." (*Id.* at 706.)

The conversations between Ms. Wellington and bank employees were recorded, and Mr. Asante can be heard giving directions to her in the recordings. The audio is available to the Court upon request.

Ms. Wellington was not the only coconspirator who identified Mr. Asante as the leader. Mohamed Toure also admitted in his Statement of Facts that he "was recruited to join the conspiracy by Mr. Asante." (Toure Plea Agreement, R.146 at 766.) Mr. Toure swore under oath that "Mr. Asante also directed the criminal acts of Mr. Toure, including the form, manner, and timing of financial transactions that laundered the proceeds of romance fraud." (*Id.*)

Likewise, Mr. Lamdul identified Mr. Asante's aggravating role in his Statement of Facts. Specifically, Mr. Lamdul agreed that he "communicated regularly with Mr. Asante about the money laundering conspiracy using his cell phone." (Lamdul Plea Agreement, R.240 at 1190.) He went on to agree that "[u]sing a message app, Mr. Asante instructed Mr. Lamdul how and when to conduct financial transactions involving the proceeds of romance fraud. For example, Mr. Asante sent Mr. Lamdul the name, account number, and routing number for an account where Mr. Lamdul should wire fraud proceeds; the amount that should be wired; and what wire memo Mr. Lamdul should send with the wire." (*Id.*)

Mr. Lamdul's admissions square with his text message conversations with Mr. Asante. (*See* Exhibit H, Excerpt 2 of Conversation with Uriah Lamdul.) Mr. Asante repeatedly told Mr.

Lamdul what financial transactions to conduct to launder the romance-fraud proceeds. For example, on October 4, 2019, Mr. Asante instructed Mr. Lamdul to send $17,300 to a Navy Federal Credit Union account in Mr. Asante's name, and $20,000 to a Bank of Montreal account in a woman's name. (*Id.* at 1–2.) A week later, Mr. Asante told Mr. Lamdul to purchase a cashier's check payable to Copart—a salvage auto auction business—and buy three specific vehicles. (*Id.* at 17–22.) Mr. Lamdul followed his directions. (*Id.* at 23–24.)

In late December 2019, Mr. Asante again sent multiple instructions to Mr. Lamdul. (*See* Exhibit I, Excerpt 3 of Conversation with Uriah Lamdul.) He told him to send $10,500 to a business in Alexandria, Virginia; to send $6,000 to an individual in Newark, New Jersey; and to spend $9,605 on a vehicle. (*Id.* at 5.) Mr. Asante directed which transactions Mr. Lamdul should conduct with a banker and which with a teller. (*Id.* at 9.) He also told Mr. Lamdul what to list as the purpose of a wire. (*Id.* at 10.) He told him to list the purpose as "Komatsu Gh," and not to list "family support" as the purpose because the transaction was being conducting in a "business [account] so it looks suspicious if u say family support." (*Id.* at 10, 15.)

In his conversations with Mr. Lamdul, Mr. Asante not only provided direction to his coconspirator. He also asserted his leadership role himself. On December 6, 2019, Mr. Lamdul told Mr. Asante he wanted to meet up to talk. (*See* Exhibit J, Excerpt 4 of Conversation with Uriah Lamdul.) Mr. Asante asked, "Is it about Eric?", referring to codefendant Eric Ahiekpor. (*Id.* at 2.) Mr. Asante continued, "Heard he working wit u," and that "OB"—a nickname for codefendant Kwame Yeboah—had told Mr. Asante. (*Id.*) Mr. Lamdul replied, "Nah." (*Id.* at 3.) In response, Mr. Asante said, "Bro I luv u so be careful n don't work wit him cos u ain't gon like it." (*Id.* at 4.) He continued, "*I trained him* n now he think he know lol." (*Id.* (emphasis added).)

This admission that he trained his codefendant in money laundering reinforces the finding that Mr. Asante was an organizer or leader.

Mr. Asante also repeatedly directed codefendant Kwame Yeboah. On December 6, 2017, he sent Mr. Yeboah a photograph of an $85,000 wire sent by a victim of romance fraud. (*See* Exhibit K, Excerpt 1 of Conversation with Kwame Yeboah, at 1.) Mr. Yeboah responded by sending a screenshot of his online banking information showing an $85,000 wire coming into his account. (*Id.* at 2.) Mr. Asante then directed Mr. Yeboah to send $50,000 to a bank account in China and discussed both Mr. Yeboah's share of the proceeds and his own share. (*Id.*)

On January 16, 2018, Mr. Asante again directed Mr. Yeboah. (*See* Exhibit L, Excerpt 2 of Conversation with Kwame Yeboah.) Mr. Asante wrote, "Send it here," and then sent account information where funds should be sent. (*Id.* at 1–2.) Mr. Yeboah replied, "Okay." Mr. Asante also directed Mr. Yeboah to "[c]heck n lemme know if it's in." (*Id.* at 2.) These are just two of several examples of Mr. Asante directing his codefendants to engage in specific financial transactions.

Part of Mr. Asante's argument against being a leader or organizer is that he lacked understanding of the scope of the underlying fraud scheme. He contends that "[i]ndividuals in Ghana lied or misled Asante about how the funds were derived." (Asante Objection Letter, R.264–1 at 1362.) This contention is wrong on the law and wrong on the facts.

On the law: A defendant can be an organizer or leader of a money laundering conspiracy even if they are not an organizer or leader of the crime from which the laundered funds were derived. To be guilty of money laundering, a person must know that the funds they are laundering represent the proceeds of "*some* form of unlawful activity." 18 U.S.C. § 1956(a)(1) (emphasis added). They need not know the specific crime that generated the proceeds, much less

14

the details of that crime. Whether someone is an organizer or leader of a money laundering conspiracy is based on their involvement in the money laundering—not on their knowledge about where the dirty money comes from. Accordingly, Mr. Asante is wrong to suggest that he could not be an organizer or leader of the money laundering conspiracy if he were misled about the particulars of the underlying fraud scheme. And based on the facts outlined above, he knew exactly what his recruits were doing and directed their laundering activity.

On the facts: Mr. Asante cannot persuasively claim that he did not know how the fraud proceeds were generated. As far back as 2014, he communicated with fraudsters about how the fraud scheme operated. A person this Sentencing Memorandum will refer to as BT told Mr. Asante, "I start they chat small dey see how far I go fit make am." (*See* Exhibit M, Excerpt of Conversation with BT, at 1.) "Chat" is a euphemism for online communications with romance-fraud victims, and in this message, BT told Mr. Asante that he started the fraud by requesting small amounts and then asking for more. Mr. Asante replied, "Yeah I hear say de chat dey bring more cash." (*Id.*) BT warned Mr. Asante that "Now police dey register [on the dating] site then act like Client"—that is, the police operate undercover as romance fraud victims on dating sites. (*Id.* at 2.) Undeterred, the next day Mr. Asante asked BT if he knew "anybody who chat n wan sm1 [and wants someone] to receive de money for dem." (*Id.* at 4.) He continued, "I hv so many accounts bro." (*Id.* at 5.) BT told Mr. Asante he would let him know. In 2014, Mr. Asante knew that funds he would be receiving were from romance fraud and nevertheless sought to get involved.

Other messages reinforce that Mr. Asante knew the funds came from romance fraud. Two came from a person in Ghana who will be referred to as GA. On February 17, 2016, GA forwarded a message to Mr. Asante from a woman who called herself "Queen Teri." (*See* Exhibit

N, Excerpt 1 of Conversation with GA, at 1.) Her message was addressed to "King Nick." (*Id.*) Queen Teri's message enumerated for King Nick all of the cash deposits she had made at the bank directly into Mr. Asante's account, totaling $233,556. (*Id.*) She signed her message, "Thanks Sweetheart!" (*Id.*) These features—nicknames, intimate sign-offs, depositing cash—are all common in online romance fraud. After forwarding the message, GA asked Mr. Asante, "U see what the woman send." (*Id.* at 2.) This message would make sense to Mr. Asante only if he knew that the funds he was laundering came from victims of online romance fraud.

Later, on April 8, 2016, GA warned Mr. Asante that someone was "involving FBI to come check money locked in [Mr. Asante's] account." (*See* Exhibit O, Excerpt 2 of Conversation with GA, at 1.) Mr. Asante dismissed his concern by saying "dat woman don know me n I don know her so let dem go ahead n do wat dey wan to do cos I have never spoken to dis woman before." (*Id.*) Mr. Asante asserted that because the woman did not know him and he had never spoken to her before, he would not get into trouble; this message, too, makes sense only if he knew the true source of the fraud proceeds.

Mr. Asante communicated with OP again on September 2, 2016. (*See* Exhibit P, Excerpt 2 of Conversation with OP.) OP asked Mr. Asante whether he had an account at Huntington Bank, and Mr. Asante replied that he previously had an account there but that the bank had closed it. (*Id.* at 2.) Mr. Asante said he had a friend with an account at Huntington Bank, and OP told him to send that information. (*Id.*) When OP told Mr. Asante that the "client" (*i.e.*, the victim) was "in Ohio," Mr. Asante grew concerned. (*Id.* at 3–4.) He asked whether OP thought it was safe. (*Id.* at 4.) OP replied that it was not safe and told Mr. Asante to find an account in a different state. (*Id.* at 5.)

Mr. Asante's knowledge of the scheme also came from his proximity to the fraudsters in Ghana. He traveled to Ghana regularly before his arrest and represented to codefendant Uriah Lamdul at least twice that he was with the Ghana-based coconspirators. On December 18, 2019, Mr. Asante and Mr. Lamdul were discussing multiple large financial transactions. (*See* Exhibit Q, Excerpt 5 of Conversation with Uriah Lamdul.) While they were trying to figure out the timing of a transaction, Mr. Asante wrote, "I'm in Ghana so I'm with dem all de time." (*Id.* at 5.) He reiterated the point a few weeks later. (*See* Exhibit R, Excerpt 6 of Conversation with Uriah Lamdul.) On January 6, 2020, he told Mr. Lamdul, "I'm here wit dem." (*Id.* at 2.)

Investigators also found a substantial number of images on Mr. Asante's cell phones that reinforce that he knew the funds were coming from online romance fraud:

- A photo of a letter from a woman who claimed she sent $80,000 in cash to a person at the direction of "somebody called Kenny Lewis who actually does not exist." She said she "fell in love with this person." The letter was unambiguously from the victim of online romance fraud. (Exhibit S, Photo of Letter from AC.)

- A screenshot of a woman from Cincinnati, Ohio, chatting with a person purportedly engaged in "peace keeping" in Syria and discussing sending funds. (Exhibit T, Screenshot of Chat with EC.)

- A screenshot of a WhatsApp message with a person who said he was "waiting for the woman." The person said "[s]he will let me know when it's done," and provided bank account information where the woman would be sending funds. (Exhibit U, Screenshot of Chat with Sunday.)

- A screenshot of another WhatsApp message with a different person who, below account information for one of Mr. Asante's bank accounts, said, "In Sha Allah they will do it within. This week." The person also said, "The woman son has come to visit her," and "[t]hat is wat is causing the delay." (Exhibit V, Screenshot of Chat with FX.)

These messages and images establish that Mr. Asante knew the true source of the fraud proceeds, as well as the scope and structure of the criminal organization. These images are unambiguous,

and his possession of them reinforces that Mr. Asante knew that the funds he laundered came from victims of romance fraud.

Mr. Asante cannot hide behind false assertions that people in Ghana lied to him or misled him. He knew the funds came from victims of romance fraud. He was in direct communication with fraudsters in Ghana. He recruited people in the United States, including his codefendants, to launder the fraud proceeds. Knowing the nature and scope of the illegal activity, Mr. Asante directed his underlings' laundering activity. He knew what was going on in his codefendants' accounts because he exercised control and authority over them and their financial activity. He deserves a four-level enhancement for being an "organizer or leader."

**C. The PSR properly holds Mr. Asante liable for $11,834,494.05 in laundered funds.**

Finally, Mr. Asante argues that his relevant conduct should be limited to the fraud proceeds that he laundered in bank accounts he directly controlled, but not the fraud proceeds that were laundered by his coconspirators. (*See* Asante Objection Letter, R.264–1 at 1362–63; PSR ¶ 109.) Not so. For similar reasons that the leadership enhancement is appropriate, his relevant conduct includes the fraud proceeds that were laundered by his coconspirators.

As a member of a conspiracy, Mr. Asante is responsible both for his own acts as well as "all acts" of his conspirators that were (1) "within the scope of the jointly undertaken criminal activity," (2) "in furtherance of that criminal activity," and (3) "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3 app. n.3(A). The actions of his coconspirators were within the scope of their joint criminal activity, were in furtherance of that activity, and were foreseeable to Mr. Asante. The facts in support of the leadership enhancement also support this conclusion. Mr. Asante recruited his codefendants to become involved in the criminal activity and "had them help him receive and transfer funds." (Plea Agreement, R.229 at

1114.) He knew the specifics of their financial transactions and directed their laundering activity. He told them when victim money would be arriving in their accounts. He told them where to send funds, how much to send, and what to list as the transaction's purpose. He instructed them how much to send to salvage auto auction businesses and which vehicles to buy. He knew what was going on in his coconspirators' accounts because he demanded that they send him screenshots or photos of their account activity as proof that they were following his directions. Mr. Asante had complete visibility into their laundering activity. Under the standards of § 1B1.3, he is properly accountable for $11,834,494.05 in laundered funds.

## II.    Based on the statutory sentencing factors, the United States recommends a term of imprisonment of 84 months.

Turning to the § 3553(a) factors, the United States recommends a sentence of 84 months in prison, a three-year term of supervised release, and a restitution order for $11,834,494.05. Forfeiture is also required.

*Nature and circumstances of the offenses.* This case is about the leader of a group of people who worked together to help fraudsters prey on vulnerable people's desire for love and connection. Mr. Asante was part of a transnational criminal organization that has defrauded men and women for years, and that has laundered millions in fraud proceeds to hide the fraud from victims, banks, and investigators. PSR ¶¶ 28–30. Fraudsters based in Ghana created fake profiles on online dating sites and connected with individuals. PSR ¶ 29. They built relationships with the individuals, and ultimately asked them for money. *Id.* These victims were often in a fragile state—elderly, sensitive, and lonely. The fraudsters took advantage of these victims' vulnerable circumstances to steal from them. Money launderers in the United States helped move the money from the victims in the United States to the fraudsters in Ghana.

Mr. Asante was the leader of the U.S.-based part of the conspiracy. PSR ¶¶ 28, 41–46. Individuals in Ghana recruited Mr. Asante to help them launder the romance fraud proceeds. PSR ¶ 41. They trained him in money laundering, and initially the fraudsters directed victims to send money to accounts in his name. PSR ¶ 42. He broke up large incoming transactions into smaller outgoing transactions and structured his financial transactions to avoid suspicion. *Id.* Mr. Asante could avoid detection for only so long, however, and banks began closing his accounts due to the suspicious financial activity. *Id.*

In response, and to support his expanding money laundering operation, Mr. Asante recruited Kwame Yeboah, Eric Ahiekpor, Mohamed Toure, Uriah Lamdul, and Alexis Wellington to launder the funds with him. PSR ¶ 41. He told them to open or use bank accounts in their control to move the criminal money. *Id.* Recruiting others allowed the conspiracy to have access to more accounts and also eventually allowed Mr. Asante to ensure his name was not tied to any of the accounts. PSR ¶¶ 41–42. Mr. Asante received information directly from scammers in Ghana and disseminated instructions to his U.S.-based coconspirators. PSR ¶ 41. Mr. Asante directed their criminal activity, including where to send the funds, when to send them, and how much to send. *Id.* In that position, he knew every detail of what each of his codefendants was doing. *Id.*

Mr. Asante was indispensable to the success of the romance fraud scheme. Without individuals in the United States to receive and launder fraud proceeds, the scammers in Ghana could not have received their criminal money. Mr. Asante recruited and maintained a network of money launderers that allowed for the success of the scheme.

Mr. Asante and his recruits laundered $11,834,494.05 in romance fraud proceeds from 232 victims. PSR ¶ 47. Loss figures for individual victims include $358,000, $300,000,

$533,918.57, $457,850, $827,000, and $414,000. *Id.* On their own, those are jaw-dropping numbers. Yet raw numbers fail to capture the pain and agony of the romance fraud victims. The PSR devotes seven pages to summaries of the victims' stories. *See* PSR ¶¶ 48–100. Some include:

- Victim RC told a fraudster that he had a son with a disability, and the person purporting to be his lover said she would help care for the son. PSR ¶ 57. He sent money at the fraudster's request. *Id.* He had to take out personal loans to cover the payments. *Id.* Once he discovered he had been defrauded, he suffered from depression and anxiety, and he received mental-health treatment as a result. *Id.* The financial losses caused him to go back to work full-time at age 68. *Id.*

- Victim HH sent tens of thousands of dollars as a result of the fraud. PSR ¶¶ 47, 63. She sent savings, retirement, and investment funds. PSR ¶ 63. She has incurred credit card debt and taken out personal loans, and now is unable to pay debts and obtain credit. *Id.* As a result of the fraud, she owes state and federal taxes. *Id.*

- Victim RB sent $160,000 to members of the conspiracy due to the fraud against him. PSR ¶¶ 47, 68. To do so, he sent retirement and other savings funds. PSR ¶ 68. The financial losses caused him to lose his vehicle and move in with his mother. *Id.* It also caused health problems, including two heart attacks, and the mental effects led him to attempt suicide. *Id.*

- Victim SY sent money and gift cards at the direction of his fraudster. PSR ¶ 79. He sent a large amount of money in total, and $24,900 to members of this conspiracy. PSR ¶¶ 47, 79. He pawned his vehicle, took out a home equity line of credit, opened new credit cards, zeroed out his savings account, and lost his home. PSR ¶ 79. Once he discovered that he had been scammed, SY became extremely depressed and attempted suicide. *Id.* A downward spiral resulted. He was unable to care for himself and was admitted to the hospital. *Id.* After more than a year of decline, he was placed in hospice care and died approximately two years after his suicide attempt. *Id.*

- Victim KM sent $287,000 to members of the conspiracy at the direction of her fraudster. PSR ¶¶ 47, 49. She lost a substantial amount of her savings and retirement funds. PSR ¶ 49. Her financial losses caused her to sell her home; she now rents a home due to poor credit. *Id.*

These stories are representative of the harm romance fraud causes. Victims commonly sent everything in their savings. They zeroed out their retirement accounts. Several filed for bankruptcy as a result of the fraud. *See, e.g.*, PSR ¶¶ 53, 64, 65, 74, 78, 84, 89. And when they

had nothing more to send, the fraudsters pressed them to borrow more. If they hesitated to do so, the fraudsters threatened personal harm or threatened to publicly release embarrassing photos that the fraudsters had received as a result of the fraud. PSR ¶¶ 59, 84, 97.

None of this happens without money launderers like Mr. Asante and the others he recruited. The fraud money made its way from the victims to the fraudsters only through their laundering activities. Mr. Asante was the leader of an essential part of a transnational criminal organization. He deserves a lengthy prison term.

*Need to afford adequate deterrence.* The sentence should account for both specific and general deterrence. Mr. Asante continues to minimize his culpability, making the far-fetched claim that "[i]ndividuals in Ghana lied or misled Asante about how the funds were derived." (Asante Objection Letter, R.264–1 at 1362.) As described above, he knew the true source of the funds at least by 2014. (*See* Exhibit M, Excerpt of Conversation with BT.) Although his admissions meet the elements of the crime, he continues to downplay his knowledge and involvement, leading to a concern that he might reoffend.

The circumstances that led to the revocation of Mr. Asante's pretrial release also demonstrate the need for specific deterrence. While awaiting trial, he caused an international flight to be booked in his name, despite not being permitted to leave Ohio without the Court's permission. (*See* Order, R.228 at 1103.) This was not a passive act; he confirmed the flight with a travel agent in two phone calls. (*Id.*) The Court found that Mr. Asante had violated the terms of his pretrial release. (*Id.*) The Court also found that he was a flight risk and that if he were not detained, he would "pose[] a risk of future economic and other nonphysical harm to the community." (*Id.* at 1104–06.) Mr. Asante's violations while on pretrial release are evidence of

his risk of future criminality, and the recommended sentence should help deter him from future crimes.

The sentence should also afford general deterrence to others. Mr. Asante is one of at least 19 individuals who have been charged related to laundering the proceeds of Ghana-based romance fraud schemes in this District alone. Investigation has shown that far more people, in this District and elsewhere, are involved in romance fraud and laundering the proceeds of romance fraud. Moreover, the Sixth Circuit has recognized that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (internal quotation marks omitted). An 84-month sentence would be a clear message that helping romance fraudsters will be punished.

*History and characteristics of the defendant.* Mr. Asante's history and characteristics are aggravating factors. He has had every opportunity to build an honest life. He immigrated to the United States in 2008, and became a naturalized United States citizen on September 15, 2016. PSR ¶ 125. Notably, he was naturalized at the height of his money laundering scheme. The conspiracy to which he pleaded guilty ran from December 1, 2014, through July 15, 2021. (*See* Second Superseding Indictment, R.152 at 782–85.)

Mr. Asante did not need to join the conspiracy out of financial necessity. Nothing in the PSR shows financial hardship or unexpected financial demands. Mr. Asante worked as an IT specialist starting from 2016 to 2021. PSR ¶ 148. He made up to $55 per hour, which over the course of a year would amount to a six-figure salary. *Id.* But that was not enough for Mr. Asante. During the same time period, he led the money laundering conspiracy. He committed his crimes because of his greed.

Given the nature and circumstances of Mr. Asante's offenses, his history and characteristics, the need for deterrence, and the other facts and circumstances of this case, the recommended sentence would satisfy 18 U.S.C. § 3553(a).

## CONCLUSION

For the above reasons, a sentence of 84 months of imprisonment, 3 years of supervised release, and a restitution order of $11,834,494.05, jointly and severally with his codefendants, would be sufficient but not greater than necessary to achieve the statutory goals of sentencing.

**Respectfully submitted,**

KENNETH L. PARKER
United States Attorney


s/ Peter K. Glenn-Applegate
PETER K. GLENN-APPLEGATE (0088708)
DAVID J. TWOMBLY (0092558)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone No.: (614) 469-5715
Fax No.: (614) 469-5653
Email: peter.glenn-applegate@usdoj.gov
        david.twombly@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Sentencing Memorandum of the United

States was served this 23rd day of December, 2022, electronically upon counsel for the

Defendant.

s/Peter K. Glenn-Applegate
PETER K. GLENN-APPLEGATE (0088708)
Assistant United States Attorney
